UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-10034-CIV-KING
MAGISTRATE JUDGE P. A. WHITE

ROBERT MICHAEL SHEPARD,            :

    Plaintiff,                     :

v.                                 :          REPORT OF
                                              MAGISTRATE JUDGE
SHERIFF BOB PERYAM, et al.,        :

    Defendants.                    :
_____

## I   INTRODUCTION

Plaintiff Shepard, who professes to follow the Muslim faith, filed a *pro se* civil rights complaint pursuant to 42 U.S.C. §1983 (DE#1) and an Amendment (DE#66), alleging that while confined at the Monroe County Detention Center ("MCDC"), acts or omissions of named defendants abridged his First Amendment religious rights.

In his original complaint (DE#1) Shepard named three defendants: Richard Roth, [former] Monroe County Sheriff; Kenna Allen, MCDC Director of Programs Services; and Linda Alvarez [former] Director of Trinity Food Services at MCDC ("Trinity"). They allegedly denied him religious services, prayer beads, a prayer rug, a Kufi (prayer cap), and a Kosher diet. Shepard specifically requested only injunctive relief, and made no request for damages in any form. In his one-page amendment (DE#66), Shepard added Trinity Food Services Manager, Michelle Parks, as a new defendant, claiming he had learned that she was responsible for the termination of his religious diet. The amendment DE#66 included no request for relief.

Three summary judgment motions are pending: (DE#81) by Alvarez; (DE#88) by Allen and Roth; and (DE#95) by Parks [whose correct name is Park, see DE#96-2].

### Individual Capacity Versus Official Capacity Claims

The pleadings were silent as to whether the defendants were sued in their individual or official capacities, or both. A Preliminary Report and a Report which screened the original complaint and amendment for sufficiency (DE#s 6 and 69), recommended that claims proceed against defendants Roth, Allen, Alvarez, and Park, in their individual capacities. This has apparently cause confusion.

A motion by former Sheriff Roth (Motion, DE#73), requesting that the new Sheriff Bob Peryam be substituted as the proper party, was granted (Order, DE#74). Subsequently, as noted above, Roth, not Peryam, joined in the motion for summary judgment (DE#88). In doing so, Roth dropped a footnote, arguing that because the defendant had been sued in his individual capacity, the request for substitution was in error, and the substitution was unnecessary and improper.

In addition, as further discussed, below, defendant Alvarez argues in pertinent part in her summary judgment motion that plaintiff Shepard cannot obtain injunctive relief from her, because she is no longer Trinity's food Service Director at MCDC. If however, *assuming arguendo*, it were determined by the Court that Shepard would otherwise be entitled to injunctive relief from Alvarez on his religious dietary claim if she were still employed, then it appears such relief would properly be obtained from Alvarez's unnamed successor, and that that individual would properly be substituted for Alvarez, pursuant to Fed.R.Civ.P. 25(d).

While a plaintiff has a duty to make plain who they are suing, see Colvin v. McDougall, 62 F.2d 1316 1318 (11 Cir. 1995), a plaintiff is not always required to designate with particular words in his pleading that the action was brought against defendants in their individual or official capacities, or both see Hobbs v. Roberts, 999 F.2d 1526, 1529-30 (11 Cir. 1993). How a complaint and claims are construed, in regard to the capacities in which the defendants are being sued, may depend on the nature of the claims raised, and defenses asserted. See Adams v. Franklin, 111 F.Supp. 1255 (M.D.Ala. 2000). In this case, where time has passed, more than one named defendant is no longer working at or within in the Monroe County jail system [Richard Roth, who is no longer Sheriff, was replaced by Bob Peryam; and Linda Alvarez, who is no longer a Trinity employee at MCDC, has presumably been replaced by an unnamed Food Services Director]. For now, plaintiff Shepard remains incarcerated at the MCDC, so that with respect to him there has been no change in his place of incarceration which would moot his claims for injunctive relief. (See Spears v. Thigpen, 846 F.2d 1327 (11 Cir. 1988); Cotterall v. Paul, 755 F.2d 777 (11 Cir. 1985) (an

2

inmate's transfer or release renders moot his claims for injunctive and/or declaratory relief)).  Shepard's focus is to obtain an Order requiring persons, with authority to do so, to accommodate his demands relating to Islamic services, diet, and access to religious items (beads, rug, and Kufi), so he can worship in the manner he believes should be permitted. Since Shepard, a *pro se* litigant, seeks changes in his conditions while he remains incarcerated at the MCDC, it is illogical that he would intend to bring claims against identified defendants solely in a capacity that would fail if the named individual was replaced by a successor.

It appears that plaintiff Shepard's claims should be construed to have been raised against defendants not only in their individual capacities, but also their official capacities, since logically it would be named defendants who are still employed, or persons now in jobs formerly held by named defendants who are no longer employed, who would have authority to provide any relief, if it were granted.

It appears, therefore, that Shepard's claims for injunctive relief should be deemed to be lodged against the defendant Sheriff (formerly Roth/now Peryam), the defendant MCDC Programs Services Director (formerly and presently Allen); the Trinity Food Services Director at MCDC (formerly Alvarez/now an unknown successor); and the Trinity Food Services Manager (formerly and presently Park).

**This Cause is now before the Court upon three motions: (1) a Motion for Summary Judgment (DE#81) by Alvarez; (2) a joint Motion for Summary Judgment (DE#88) by Allen and Roth; and (3) a Motion to Dismiss, or alternatively for Summary Judgment (DE#95) by Park,** as to all of which the plaintiff was advised of his right to respond (<u>see</u> Orders of Instruction, DE#s 84, 89 and 100).[1]

---

[1]     Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is proper

> [i]f the pleadings, depositions, answers to interro-
> gatories, and admissions on file, together with the
> affidavits, if any, show that there is no genuine issue
> as to any material fact, and that the moving party is
> entitled to judgment as a matter of law.

<u>Fed.R.Civ.P.</u> 56(c).

## II  DISCUSSION

### A.  Monroe County Detention Facilities (MCDF) Policy (and Related Letters from Counsel)

In this case, the most recent version of MCDC Inmate Services Policy and Procedures, No. 6:018, captioned "Religious Programs, Materials, Diets, and Clergy Visits" (DE#88-4) has a "Revised Date" of 12/31/08, and states that the person responsible is the "Programs Services Director." It was propounded between the submissions of plaintiff Shepard's complaint [DE#1, filed in April 2008], and the defendants' summary judgment motions [DE#s 81, 88,

---

In Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the Court held that summary judgment should be entered only against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. (citations omitted). Thus, pursuant to Celotex and its progeny, a movant for summary judgment bears the initial responsibility of informing the court of the basis for his motion by identifying those parts of the record that demonstrate the nonexistence of a genuine issue of material fact. This demonstration need not be accompanied by affidavits. Hoffman v. Allied Corp., 912 F.2d 1379, 1382 (11 Cir. 1990).If the party seeking summary judgment meets the initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party, to come forward with sufficient evidence to rebut this showing with affidavits or other relevant and admissible evidence. Avirgan v. Hull, 932 F.2d 1572, 1577 (11 Cir.), cert. denied, 112 S.Ct. 913 (1992). It is the nonmoving party's burden to come forward with evidence on each essential element of his claim sufficient to sustain a jury verdict. Earley v. Champion International Corp., 907 F.2d 1077, 1080 (11 Cir.1990). The non-moving party cannot rely solely on his complaint and other initial pleadings to contest a motion for summary judgment supported by evidentiary material, but must respond with affidavits, depositions, or otherwise to show that there are material issues of fact which require a trial Fed.R.Civ.P. 56(e); Coleman v. Smith, 828 F.2d 714, 717 (11 Cir. 1987). If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); Baldwin County, Alabama v. Purcell Corp., 971 F.2d 1558 (11 Cir. 1992). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11 Cir. 1990) (citing Anderson v. Liberty Lobby, Inc., supra).

Upon the filing of defendants' motions for summary judgment (DE#s 81, 88, and 95), Orders of Instruction (DE#s 84, 89, 100) were entered pursuant to Brown v. Shinbaum, 828 F.2d 707 (11 Cir. 1987), for the purpose of informing the plaintiff Shepard of his right, as a pro se litigant, to respond to the defendants' summary judgment motions. The Orders also instructed plaintiff about requirements under Fed.R.Civ.P. 56 for a proper response or responses to such motions.

and 95, filed in February and March 2009].

A prior version of the policy No. 6:018, dated 5/5/00, is included among unscanned documents submitted by the plaintiff which are located in the official Court record, at DE#110, in Expansion Folder 4:08CV10034-X1. (It is part of DE#110, Composite Ex.B.) It is unclear from the record whether this May 2000 version/revision of the Policy was the one in effect on April 19, 2008 when plaintiff Robert Shepard signed his initial complaint in this case. The 5/5/00 policy is largely similar to the one dated 12/31/08. The May 2000 version stated that the responsible person was "Program Services Director/Chaplain." In brief, the May 2000 Policy, referred to a Chaplain who would coordinate all aspects of religious programs within the Monroe County Detention Facilities. The 2000 policy stated that subject to concerns relating to institutional order and security, religious services "will be held for all inmates desiring to participate"..."to be coordinated through the Programs Services Director/Designee." The policy provided that distribution of religious materials required submission of Inmate Request Forms from inmates to the Chaplain, for approval. It provided that donated religious materials were subject to approval and inspection for contraband by the Chaplain, who then was responsible for distribution of materials to inmates. The 2000 policy referred to Ministerial volunteers (ministers who wished to visit inmates of their congregation) being allowed to visit inmates during regular visiting hours. It provided that the Chaplain, "if requested...will assist inmates in contacting their minister." The policy outlined procedures for entry of Ministers, lay persons, and clergy volunteers, for purposes of various religious activities; and the policy provided that a current list of authorized volunteers would be kept in Main Control at the jail.

The 12/31/08 policy revision (DE#88-4), which is more detailed, and appears to be the current written policy/procedures governing Monroe County Detention Facilities (MCDF), provides as follows. It is policy of the MCDF to ensure inmates are permitted to practice the religion of their choice, provided that it does not constitute a security breach. (DE#84-4, at p.2, §I).

With regard to religious services the Monroe County detention facilities shall allow clergy the ability to visit inmates to encourage their participation in religious programs. (Id. at p.2, Policy §I). Volunteer chaplains, i.e., ordained ministers who coordinate religious services and activities, affording each inmate a reasonable opportunity to practice their own religious beliefs (Id., at §IV), shall have access to all non-prohibited areas of the detention facilities unless there is a clear and present danger for his/her safety (Id., §V.A.). Religious Services will be held for all inmates desiring to participate, except those considered to be a threat to the security and orderly operation of the facility. (Id., §V.C.1). The services will be coordinated through the Programs Services Director/Designee to ensure sufficient space for the type of programs and to avoid conflicts with other scheduled activities. (Id., §V.C.2.). In addition, at periodic intervals, volunteer chaplains will tour areas where inmates don't have religious access because of lock-down or sickness to give them religious needs and to provide adequate support. (Id., at §V.D.). Volunteer Ministers who wish to visit inmates may visit during regular visiting hours. If requested, volunteer Chaplains will assist inmates in contacting their minister. Requests for special visits must be initiated by the inmate to the Programs Services Department. (Id., at p.5, §G.1). Ministers, lay people, and clergy volunteers wishing to enter the facilities must contact the Programs Services Department for clearance into the facility, and for scheduling of programs, and are provided a Handbook for Volunteer Staff containing an application that must be filled out. Id., at p.5, §§V.G.2.a. and G.2.b.).

As for access to and distribution of religious materials, the MCDF Policy provides that materials which are donated shall be processed through the Programs Services Director before the volunteer Chaplain gives the items to inmates. (Id., at p.4, §V.F.3.). Items that are permitted include one set of breakaway prayer beads. (Id., §V.F.3.a.(4)). Items which are contraband include all religious clothing, scarves, headgear, or foot covers of any kind, (Id., at p.5, §V.F.3.b.(1), and rugs or mats (Id., at §V.F.3.b.(2)).

Regarding Religious Diets, the jail policy, recognizing that dietary restrictions may apply to certain religious faiths, provides that inmates with dietary concerns shall submit an Inmate Request Form to the Programs Staff Assistant, who will forward to the inmate an Application for Religious Diet form. The inmate must complete and return the Application for Religious Diet form to the Programs Staff Assistant. The policy provides that Medical orders for specific diets supersede religious diets. (Id., at p.3; §V.E.). The policy provides that religious diets will be provided only to inmates who are members of an organized religious group requiring adherence to religious dietary laws. (Id., §V.E.1.). Affiliation with recognized religious groups and their dietary laws will be verified by the Programs Staff Assistant; and the inmate must have been affiliated with the religion prior to being incarcerated. (Id., §V.E.2.). The Programs Staff Assistant will forward a written approval letter to the Kitchen for the specified religious diet. (Id., at p.4, §V.E.3). Inmates for whom a religious diet is authorized are required to follow that diet. Inmates found eating food inconsistent with the authorized religious foods will have the authorization for religious foods revoked. Inmates found swapping food items to and/or from the religious diet with other inmates will loose the authorization for religious foods. Once the authorization for religious foods has been revoked, it will not be reinstated throughout the duration of the inmate's present incarceration. (Id. at p.4, §V.E.4.).

As part of plaintiff Shepard's un-scanned exhibits submitted with DE#110, is his Composite Exhibit "A," which includes an August 12, 2008 letter written to Shepard by Jason L. Scarberry, Esquire, the attorney representing defendants Roth/Peryam and Allen in this case. The stated purpose of that 8/12/08 letter was "to provide...a better explanation of the Monroe County Sheriff's Office policies regarding religious items, texts, services, and diets." Concerning services, the letter explained that they were performed on a voluntary basis by religious leaders from the Monroe County area, that the Sheriff's Office had not been contacted by any member of the Islamic faith who wishes to perform services at the MCDC, and although the Sheriff's Office had attempted to locate an Imam in Monroe County, its efforts proved futile. Regarding prayer beads, Attorney Scarberry's 8/12/08 letter explained that rosary beads are

not provided to Catholic inmates. A chaplain brings them when he visits the institution, and it is required that they be breakaway. The letter explained that Director Allen had been unable to locate prayer beads for Islamic worship on a website about which Shepard had informed staff through a grievance (caravanxpress.com), but that if the plaintiff could have someone send breakaway beads for him to the institution, they could be provided to him, <u>after inspection</u> [emphasis added]. Regarding Kufi caps, the letter stated that due to security concerns, under the Policy, such headwear is not allowed to be worn by inmates, or staff. The letter further explains, however, that Yarmulkes are provided [to Jewish inmates] by the Rabbi who performs religious services, and that they are distributed only during services, and the Rabbi then collects them at the end of the service, and inmates are not allowed to wear them outside of services. Regarding Prayer Rugs, the letter explained that actual prayer rugs or mats are not allowed for several reasons. These include storage space concerns, as well a concerns that a woven prayer rug can be unraveled and made into contraband items. The letter explained that towels [on which to pray] can no longer be kept, but that a towel-swapping program is operational at all times when inmates are allowed out of their cells, which provides the inmate with adequate time to perform the requirements of his faith. (Under the towel swapping program, the inmate gives up his ID and is temporarily issued a towel for use as a prayer towel, in lieu of a prayer rug. The inmate then gives up the prayer towel and retrieves his ID). Regarding Kosher diets, the letter explained that the copy of the religious diet Application, which plaintiff Shepard had signed, contained cautionary language stating that if an inmate is approved for a religious diet, and then found eating food inconsistent with his religious diet requirements, the diet will be revoked. The letter further reminded Shepard that his Application also cautioned that swapping food items with other inmates or eating regular food tray items is prohibited and is grounds for revocation; and that once revoked, a religious diet will not be reinstated during the inmate's period of incarceration. The letter informed Shepard that his religious diet had been revoked based on his consumption of food not on the Kosher diet plan. Counsel's letter to Shepard further stated that "the courts have ruled that a kosher, or vegan, diet complies with the

requirements of your religious diet," and stated "you are not entitled to the diet of your choice only a diet which complies with the requirements of your religion." (Scarberry Letter, 8/12/08).

In another un-scanned letter to inmate Shepard, dated January 22, 2009 (see DE#110, Plaintiff's Composite Exhibit A), Attorney Scarberry addressed issues about the prayer towels, and use of spaces at the MCDC. That 1/22/09 letter states that in regard to Shepard's complaint that deputies on 5 occasions had not followed polices implemented by Captain Phelps, allowing issuance of prayer towels for worship 5 times per day, the Captain had issued a memo informing all officers that he (Shepard) was to be permitted a towel for each prayer session, that he must then return it, and that he could not check out and be in possession of two towels at the same time, one for showering and another for prayer. Whatever towel he used for showering was to be turned in, and a fresh one could be obtained at the time of his next prayer session. Regarding use of spaces within the jail facility for group activities, Counsel's 1/22/09 letter informed Shepard that Captain Phelps and Director Allen had consulted and decided that "no inmate groups will be allowed to utilize any of the rooms in the jail for discussions, bible study, or any other purpose" and that "All group activities shall be conducted in a day room or in the recreation yard at the discretion of deputies on the floor." (Scarberry Letter, 1/22/09).

### B. **Pertinent Law**

### **Law Relating to First Amendment Free Exercise Claims**

Plaintiff Shepard's complaint raises claims under the Free Exercise Clause of the First Amendment, subject to analysis under the standard enunciated in Turner v. Safley, 482 U.S. 78 (1987), O'Lone v. Estate of Shabazz, 482 U.S. 342 (1987), and their progeny.

The First Amendment's Free Exercise Clause, which has been made applicable to the States through the Fourteenth Amendment, see Cantwell v. Connecticut, 310 U.S. 296, 303 (1940); and Malicki v. Doe, 814 So.2d 347 (Fla. 2002), provides that "Congress shall make no law respecting an establishment of religion, or *prohibiting the free exercise thereof...* " U.S. Const., Amdt. 1 (emphasis added.)

It is well settled that, upon their confinement, inmates do not forfeit all First Amendment rights, including the right to exercise religious practices and beliefs, O'Lone, supra; Bell v. Wolfish, 441 U.S. 520 (1979). The Courts have held, however, that a jail/prison rule may infringe on inmate's First Amendment rights if to do so is necessary to protect legitimate governmental interests, and the rule is no greater than necessary to protect those interests (i.e. if it is not an exaggerated response). Procunier v. Martinez, 416 U.S. 396, 413-14 (1974); Pell v. Procunier, 417 U.S. 817, 822-23 (1974); Turner, 482 U.S. at 87, 89 (the relevant inquiry is whether the prison regulation burdening a fundamental right is reasonably related to legitimate penological objectives of the corrections system, or whether it represents an exaggerated response to those concerns); O'Lone, supra, at 348-49.

An inmate's First Amendment Free Exercise claim is analyzed under Turner/O'Lone "reasonableness" in order to ensure that an appropriate balance is struck between the protection of fundamental rights and the deference owed to jail/prison officials, when determining constitutionality of jail/prison regulations. O'Lone, supra, at 349. An inmate must be accorded reasonable opportunity to practice his religion. However, what constitutes a reasonable opportunity is evaluated with reference to legitimate penological objectives, which include rehabilitation, deterrence and security. Turner, supra; O'Lone, supra, 482 U.S. at 348; Mosier v. Maynard, 937 F.2d 1521 (10 Cir. 1991); McElyea v. Babbitt, 833 F.2d 196 (9 Cir. 1987). Key among such governmental interests forming a legitimate basis for suppression or restriction of inmates' First Amendment rights is the need to maintain institutional order and security. See Bell, 441 U.S. at 550-51; Pell, 417 U.S. at 823.

When applying the Turner/O'Lone standard, factors to be considered in determining whether the "reasonableness" test has been met include: 1) whether there is a rational relationship between the regulation and the legitimate government interest being asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that accommodation of the right will have on

the prison system; and 4) whether ready alternatives to the regulation exist which accommodate the right and satisfy the governmental interest. <u>Turner</u>, <u>supra</u> at 89-91; <u>Brunskill v. Boyd</u>, 141 Fed.Appx. 771, 2005 WL 1208632, at *2 (May 10, 2005, 11 Cir. (Fla.)); <u>Fromer v. Scully</u>, 874 F.2d 69 (2 Cir. 1989); <u>Daker v. Ferrero</u>, 475 F.Supp.2d 1325, 1348 (N.D.Ga. 2007). The fourth factor considers whether "a prisoner has pointed to some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a *de minimis* cost to the valid penological goal." <u>Overton v. Bazzetta</u>, 539 U.S. 126, 136 (2003).

For the proposition that administrative or monetary costs are also appropriate factors to consider in determining if a chosen means of accommodation is valid, <u>see</u>: <u>Hakim v. Hicks</u>, 223 F.3d 1244, 1247-49 (11 Cir.000)(applying <u>Turner</u> reasonableness standard, holding that where there was no evidence that doing so would create an administrative or other burden on the DOC or that costs were anything but *de mininis*, it was unreasonable to refuse to add a prisoner's religious name to his ID Card, in addition to his committed name); <u>Lawson v. Singletary</u>, 85 F.3d 502, 508-09 (11 Cir. 1996)(citing S. Rep. No. 111, 103d Cong., 1st Sess. 10, U.S.Code Cong. & Admin.News 1993 pp. 1892, 1899-1900)(noting that based on the legislative history of RFRA, Congress expressly assumed that the Courts would apply RFRA in the prison context within the framework of prior case law...that the legislation clearly intended courts to continue to afford deference to the judgment of prison officials ...including "the tradition of giving due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with considerations of costs and limited resources..."); <u>Martinelli v. Dugger</u>, 817 F.2d 1499, 1504-06, 1508 (11 Cir. 1987)(a jail should accommodate an inmate's dietary restrictions, subject to budgetary and logistical limitations, but only when the belief is "truly held").

### <u>Law Relating to Qualified Immunity</u>

The defendants, in each of their motions, aside from arguing that they did not violate plaintiff Shepard's First Amendment

rights, assert that they are entitled to qualified immunity.

The defense of qualified immunity offers "complete protection for government officials sued in their individual capacities as long as 'their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known.'" Thomas v. Roberts, 261 F.3d 1160, 1170 (11 Cir.2001) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982))(additional quotations omitted). The purpose of this immunity is to allow government officials to carry out their discretionary duties without fear of personal liability or harassing litigation, see Anderson v. Creighton, 483 U.S. 635, 638 (1987), protecting from suit "all but the plainly incompetent or one who is knowingly violating the federal law." Willingham v. Loughnan, 261 F.3d 1178, 1187 (11 Cir.2001). Because qualified immunity is a defense not only from liability, but also from suit, it is important for a court to ascertain the validity of a qualified immunity defense as early in the lawsuit as possible. Hunter v. Bryant, 502 U.S. 224, 227 (1991); GJR Invs., Inc. v. County of Escambia, 132 F.3d 1359, 1370 (11 Cir.1998).

Qualified Immunity attaches to discretionary conduct of government officials that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). See Mitchell v. Forsyth, 472 U.S. 511, 528 (1985) (officers immune unless their actions were "clearly proscribed" by established law). Thus, in order to receive qualified immunity, the public official "must first prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" Courson v. McMillian, 939 F.2d 1479, 1487 (11 Cir.1991) (quoting Rich v. Dollar, 841 F.2d 1558, 1563 (11 Cir.1988)). If the defendant was not acting within his discretionary authority, he is ineligible for the benefit of qualified immunity. But once the defendant establishes that he was acting within his discretionary authority, the burden then shifts to the plaintiff to show that qualified immunity is not appropriate. See Id.

The Supreme Court has set forth a two-part test for evaluating

a claim of qualified immunity. As a "threshold question," a court must ask, "[t]aken in the light most favorable to the party assert-ing the injury, do the facts alleged show the officer's conduct violated a constitutional right?" <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001) (citing <u>Siegert v. Gilley</u>, 500 U.S. 226, 232 (1991). If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. <u>Saucier v. Katz</u>, <u>supra</u>, 533 U.S. at 201. On the other hand, if a constitutional right would have been violated under the plaintiff's version of the facts, the court must then determine "whether the right was clearly established." <u>Id</u>. This second inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." <u>Id.</u>; <u>see</u> <u>also</u> <u>Marsh v. Butler County</u>, 268 F.3d 1014, 1031-33 (11 Cir.2001) (en banc).

The right in question cannot be simply a generalized right, like the right to due process, <u>Anderson v. Creighton</u>, 483 U.S. 635 (1987). Rather, it must be clearly established in a "particularized" sense, so that "the contours of the right" are clear enough for any reasonable official in the defendant's position to know that what the official is doing violates that right. <u>Anderson</u>, <u>supra</u>, 483 U.S. at 639-40. As a rule, a right is "clearly established" when it is enunciated by a court of controlling authority in the defendant's jurisdiction in a case sufficiently similar in its facts "that a reasonable officer could not have believed that his [instant] actions were lawful." <u>Wilson v. Layne</u>, 526 U.S. 603, 616-617 (1999). While "general statements of the law are not inherently incapable of giving fair and clear warning," they do so only if their application to a specific set of facts is apparent. <u>United States v. Lanier</u>, 520 U.S. 259, 271 (1997). The Court of Appeals for the Eleventh Circuit has held that in this Circuit the law can be "clearly established" for qualified immunity purposes, "only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose." <u>Jenkins v. Talladega City Bd. of Education</u>, 115 F.3d 821, 826-27 n. 4 (11 Cir. 1997) (en banc).

In this instance, if, under the plaintiff's version of the

13

facts, the law is clearly established at the time of the alleged deprivation, then the court must proceed to conduct an inquiry under <u>Turner</u> and <u>O'Lone</u> to determine if the defendant's action which allegedly abridged the plaintiff's constitutional right was reasonably related to a legitimate penological objective.

### C.   <u>Analysis</u>

### 1. <u>Religious Services</u>

The plaintiff complained in his complaint that he had been a pretrial detainee for 7 months, that he had asked to have a cleric of his faith come to hold Juma [Jum'ah] services on Fridays, that he received no response, and was being denied religious services. In his Response (scanned at DE#110, p.8) Shepard asserts that the Sheriff's Office had not contacted a member of the Islamic faith to hold services at the MCDC, and referring to Requests/grievances numbered 18, 20, 22, 24, and 26 [<u>see</u> un-scanned Composite Ex.C at DE#110] he states that he tried to informally hold services with other Islamic inmates and was stopped from doing so.[2]

---

[2]    In numerical order, the Requests/grievances #s 18, 20, 22, 24, and 26, were as follows.

<u>Request #18</u>: On 1/14/09 Shepard stated that he and inmates professing Suffi and Sunni Islamic faiths, were having a religious discussion, when officer Powell told Shepard to separate from the group because he was being too loud. The response indicates he had been told that yelling in the day room, regardless of the subject, was not allowed, and that he could take his discussion outside.

<u>Request #20</u>: On 12/4/08 Shepard asked permission to hold "congragation [sic] prayer" in a room on C Block, and requested 2 blankets for the floor; he asked who could approve an Islamic video, and who could show it to the inmates; and he inquired if he could purchase a case of Qurans to distribute to the inmates. In Response, he was told that Programs Staff had no problem with his requests, but that the decisions would have to be made by Director Allen.

<u>Request #22</u>: On 11/30/08 Shepard sought permission to hold prayer and classes in the room in C Block on Fridays "during lock down 12-1 or any other time," to have Islamic videos sent in since MCDC doesn't offer Islamic services, and stating that he [Shepard] is qualified to teach and hold prayers. The response from Officer S.R. Williams stated that if he wishes to hold a prayer service with other inmates he must let the officer know what he is doing, and the session must be held during non-lockdown hours. In addition Shepard was told that "inmates are not allowed to govern other inmates (from any other dorm or unit) to conduct any types of services," and was further instructed, "If you know of someone from outside to do Muslim services for the inmates please provide a name and number, and we will be glad to contact them."

<u>Request #24</u>: On 4/22/08, Shepard complained to Director Allen, requesting a prayer rug or alternatively a slip saying he can keep a towel in his bin for prayer 5 times per day, and that he be allowed to have prayer beads and a Kufi,

14

Shepard has stated that he is Muslim, that he has taken the Islamic name Amir Isaal Abullah, and that he used that name on his children's birth certificates. (Shepard Depo, DE#88-3 at T/4). It is not disputed that his faith is sincere. It is undisputed that Muslims engage in Jum'ah services/worship on Fridays. It also is not disputed that formal Friday services were not conducted by an Imam at the MCDC during the period relevant to this action. The record indicates that this did not occur because the institution relies entirely on volunteer clergy from the various faiths. Shepard was informed that if he had an Islamic cleric with whom he had worshiped outside the jail, or knew of another one who might be willing to volunteer at the MCDC, the staff would contact them to see if they were willing to come to the jail and minister to the Islamic inmates' religious needs. No such individual was identified by Shepard, and no volunteer Islamic cleric has approached the MCDC to offer his guidance/services as a religious leader, nor have any Muslim organizations or individuals approached the MCDC or Sheriff's Office indicating willingness to assist in this manner. (See Affidavit of MCDC Captain Penny Phelps, DE#88-2).

As indicated by Shepard's exhibits (including responses to his aforementioned Requests/grievances [note 2 supra], and the 1/22/09 Scarberry Letter) Shepard and/or other inmates of Islamic faith were allowed to hold informal religious discussions. These were permitted in the day room or recreation yard, at the discretion of deputies in charge on the floor at the time, so long as the

---

and be provided a Halal diet. He also accused Programs/chaplain of being in violation of the terms of a "Stipulation and Agreement of Settlement" signed by the Honorable William M. Hoeveler, United States District Judge, in Edward Kite McIntire, et al. v. Richard Roth, et al., Case No. 80-1721-Civ-WHM, because "you programs/chapain are to provide clergy for all faiths."

Request #26: On 5/23/08 Shepard complained to Captain Phelps that for 8 months he had been asking Director Allen to allow him prayer beads, a Kufi, and a prayer rug, and that his requests had been denied on security grounds. He complained that he was told that his prayer beads weren't break away; and he asked that the jail help him get prayer beads from "Caravan Xpress.com" which "sells to correctional facilities all over the country." Shepard further complained that he was just told by a Jewish inmate that he is allowed to have his Yamulka and other items, and argued that since a Kufi is similar to a Yamulka, and Kikhu prayer beads are like rosary beads, he should be allowed to have them. He stated it was his feeling that Director Allen "has something against Muslims." Captain Phelps responded, assuring Shepard that "no one has anything against Muslims," and that "we are researching your request with other jails and through our legal counsel."

deputies were asked in advance to make sure there were no conflicts, and so long as there was no disturbance created.

MCDF policy 6:018 provides for clergy to contact MCDC & volunteer, and relies entirely upon voluntary clergy for all faiths. Such reliance on voluntary clergy to conduct some religious services has been held by the courts to be reasonably related to security and budget concerns. See Lawson v. Singletary, 85 F.3d 502, 510 (11 Cir. 1996); see also Overton v. Bazzetta, 539 U.S. 126, 135 (2003)(explaining that Courts are "particularly deferential" to regulatory judgments by prison administration regarding security and allocation of financial resources). The fact that no Imam has contacted the institution, and that services have not been provided, does not amount to a constitutional deprivation. In affording inmates a reasonable opportunity to worship, a jail or prison is not required to allocate their resources, including facilities or personnel to different faiths in proportion to the number of inmates in each faith group or denomination. See Cruz v. Beto 405 U.S. 319, 322, n.2. (1972); Thompson v. Commonwealth of Ky., 712 F.2d 1078, 1081-82 (6 Cir.1983); see also Allard v. Abramaitys, No. 94-2161, 1995 WL 293890, at *2 (6 Cir. May 12, 1995). Rather, an institution must make a "good faith accommodation of the [inmate/prisoner's] rights in light of practical considerations." See Freeman v. Arpaio, 125 F.3d 732, 737 (9 Cir. 1997); Allen v. Toombs 827 F.2d 563, 569 (9 Cir.1987) (citing Gittlemacker v. Prasse, 428 F.2d 1, 4 (3 Cir. 1970). Courts have held that jail or prison officials have no affirmative duty to provide inmates of particular faiths full time chaplains or priests, and may fulfill their good faith efforts to accommodate an inmate plaintiff's rights through volunteers who come from the community outside the institution. See Allen, supra 827 F.2d at 569; Akbar v. Gomez, 122 F.3d 1069, 1997 WL 547944, *2 (9 Cir. (Cal.)). See also Burridge v. McFaul, No. 97-3950, 1999 WL 266246, at *2 (6 Cir. Apr. 23, 1999) (unpublished decision, in which the Sixth Circuit affirmed summary judgment for defendant on claim that prison officials failed to afford the plaintiff access to a rabbi; and in so holding, the Court stated that "[t]he First Amendment does not require prison officials to provide religious leaders of the inmate's choice...The prison minister swore in an affidavit that he had attempted to have a rabbi visit Burridge"); A'La v. Cobb, No. 98-5257, 2000 WL 303014, at *1 (6 Cir. Mar. 14, 2000) (rejecting Free Exercise claim; "The First Amendment does not

16

require that prison officials provide inmates with the best possible means of exercising their religious beliefs...”); <u>Riggins-El v. Toombs</u>, No. 96-2484, 1997 WL 809980, at *2 (6 Cir. Dec. 23, 1997) (rejecting Free Exercise claim; “As a general principle, a prison is not required to employ chaplains representing every faith among the inmate population...Consequently, Riggins-El's claim regarding the lack of a Muslim chaplain at IMAX is without merit.”); <u>Allard v. Abramaitys</u>, No. 94-2161, 1995 WL 293890, at *2 n. 1 (6 Cir. May 12, 1995)(affirming summary judgment for defendants; “To the extent that some of the cancelled meetings involve the failure of a volunteer practitioner of Native American rituals to appear at the prison, the plaintiff offers no reason why this failure to appear should be held against the prison authorities.”).

Here, where volunteer Imams were not available to come into the MCDC facility, each Friday, or at other times, for organized worship, Shepard and other Muslim inmates had alternative means of exercising their faith at MCDC, including individual worship or prayer, or apparently informal group discussions at locations and times, and in manners, that were consistent with institutional order and security. <u>See</u> <u>McCorkle v. Johnson</u>, 881 F.2d 993, 996 (11 Cir. 1989)(explaining that the inquiry into alternative means asks “whether under the restrictions imposed, the plaintiff is deprived of all means of practicing his religion”). Under the circumstances, in this case, it is apparent, with regard to the claim that they were responsible for denying Shepard Muslim religious services, that the defendants Sheriff Roth and/or his successor Peryam, and Director Allen, are entitled to qualified immunity.[3]

It is noted that in his pleadings and exhibits the plaintiff refers to an agreement in <u>Edward Kite McIntire, et al. v. Richard Roth, et al.</u>, Case No. 80-1721-Civ-WHM, concerning conditions at the Monroe County Jail, which was reached by parties with the approval of the Honorable William M. Hoeveler, United States District Judge. Shepard has argued that it was agreed in <u>McIntire</u>

---

[3]     Research reveals no decision by the Eleventh Circuit, or Supreme Courts of the United States or Florida, holding that reliance of a Jail System or its Chaplain on outside volunteer clergy [Imams for Muslim inmates] constitutes a Free Exercise violation under the First Amendment, even if Islamic clergy are not identified, and as a result no formal services are held. Nor has plaintiff Shepard met his burden of identifying any such precedent, in rebuttal to the defendants' assertion of entitlement to qualified immunity.

that the jail administration would provide clergy to assist its inmates to worship; and Shepard contends that the failure of MCDC administration to provide a Muslim cleric (Imam) to lead services, is therefore a violation of the McIntire agreement. For reasons discussed, supra, the volunteer clergy arrangement currently in use at the MCDC, even if a volunteer Imam is not available, does not violate the First Amendment. To the extent that the plaintiff has asserted that defendants in this case are in violation of the McIntire agreement concerning conditions at the Monroe County Jail, this case is not the proper vehicle to seek enforcement of the same. See Reynolds v. McInnes, 338 F.3d 1201, 1208 (11 Cir. 2003) (to enforce a consent decree against a defendant in alleged noncompliance therewith, the plaintiff must move the court to issue an order to show cause why defendant should not be adjudged in civil contempt and sanctioned); See Also Florida Ass'n for Retarded Citizens, Inc., v. Bush, 246 F.3d 1296, 1298 (11 Cir. 2001) (disagreeing with the district court's assertion that plaintiffs should seek relief to which they assert they are entitled under a consent decree, by bringing a new lawsuit) (citing Local Number 93, Int'l. Assoc. of Firefighters, AFL-CIO v. City of Cleveland, 478 U.S. 501, 524, n.13 (1986) (noting that benefits of consent decrees include avoiding re-litigation of facts, flexibility of enforcement procedures available to courts, an channeling of litigation to single forum), and United States v. City of Northlake, Illinois, 942 F.2d 1164, 1168 (7 Cir. 1991)(noting that requiring a new lawsuit to enforce consent decree would undermine goal of avoiding protracted litigation)).

## 2.  Headwear (Kufi Cap)

In this case, the plaintiff complains that he has been denied the right to obtain, keep, and use a Kufi cap, a traditional form of headgear worn by persons of the Muslim faith. As discussed supra, in Section II.A. of this Report, the written MCDC Policy 6:018 prohibits use of any headwear by inmates or staff, for reasons of security. As stated in the Affidavit of Captain Penny Phelps, this is because inmates could hide weapons or other contraband under the hats, and the hats could conceivably become a "negotiable" item, for use with other inmates, to obtain things or favors (sex, canteen items, services, drugs, etc.), thereby creating a different kind of threat to jail order or security.

In 2007, the District Court for the Northern District of

Georgia decided <u>Daker v. Ferrero</u>, 475 F.Supp.2d 1325, 1350-51 (N.D.Ga. 2007), vacated, in part, on other grounds, by <u>Daker v. Ferrero</u>, 506 F.Supp.2d 1295 (N.D.Ga. 2007). The <u>Daker</u> Court was faced with a claim that the plaintiff Waseem Dakar, a professed Muslim, like other Georgia inmates of that faith at the same institution, had been unlawfully restricted from wearing a Kufi, as an expression of religious faith, outside of prayer meetings. The Court noted that the Eleventh Circuit had not yet ruled on a First Amendment challenge to a prison or jail policy restricting use of religious headwear by inmates. The <u>Daker</u> Court observed that "[n]evertheless, other courts have been virtually uniform in upholding no-headwear policies as reasonably related to security, disciplinary, and sanitary concerns" (<u>Daker</u>, <u>supra</u>, 475 F.Supp.2d at 1350-51) (collecting cases, including opinions from the 2nd, 7th, 8th, 9th and 10th Circuits).[4]

---

[4]     Cases cited by the Daker Court included the following: <u>Portley-El v. Zavaras</u>, 188 F.3d 519, 1999 WL 542631, at *2 (10 Cir. Jul.27, 1999) ("Because ... religious headgear may be used to conceal drugs, weapons, or other contraband, and may spark internal violence among prisoners, the wearing of such headgear poses a potential security threat and restricting its wear is entirely appropriate."); <u>Young v. Lane</u>, 922 F.2d 370, 375-77 (7 Cir.1991) (sustaining prohibition on wearing religious headwear in prison's general population as reasonably related to the prison's "strong interest in uniform dress regulations" and security); <u>Benjamin v. Coughlin</u>, 905 F.2d 571, 578-79 (2d Cir.1990) (sustaining prohibition on wearing of Rastafarian crowns); <u>Standing Deer v. Carlson</u>, 831 F.2d 1525, 1528 (9 Cir.1987) (upholding no-headwear policy as reasonably related to cleanliness, security, and *1351 safety); <u>Butler-Bey v. Frey</u>, 811 F.2d 449, 451 (8 Cir.1987) (rejecting inmate's claim that prohibition on wearing of fez violates First Amendment); <u>Rogers v. Scurr</u>, 676 F.2d 1211 (8 Cir.1982) (rejecting Muslim inmates' First Amendment challenge to policy forbidding religious headwear in prison's general population); see also <u>Nicholas v. Tucker</u>, 2001 WL 228413, at *2 (S.D.N.Y. Mar.8, 2001) (finding officer entitled to qualified immunity in claim brought alleging restrictions on inmate's wearing of kufi because "a reasonable officer ... could have concluded that a weapon or contraband could have been concealed under Nicholas' kufi") vacated on other grounds, 40 Fed.Appx. 642, 643 (2 Cir.2002); <u>cf.</u> <u>United States v. James</u>, 328 F.3d 953, 957 (7th Cir.2003) (Easterbrook, J.) ("The Constitution does not oblige the government to accommodate religiously motivated conduct that is forbidden by neutral rules, and therefore does not entitle anyone to wear religious headgear in places where rules of general application require all heads to be bare or to be covered in uniform ways").

     In <u>Rogers v. Scurr</u>, the Eighth Circuit Court of Appeals rejected a challenge of a policy that permitted Muslim prisoners to wear skullcaps only when attending religious ceremonies. <u>Rogers</u>, <u>supra</u>, 676 F.2d at 1215. In <u>Rogers</u>, the district court below held the policy violated the First Amendment because prison officials could adopt a less restrictive policy that allowed inmates to wear skullcaps in the prison's general population subject to reasonable searches. <u>Id.</u> The Eighth Circuit, however, reversed, holding that the policy was "substantially warranted by the requirements of prison safety and order," and was an "eminently

Here, it is noted that the Eleventh Circuit, more recently, in Hathcock v. Cohen, No. 07-13596, 287 Fed.Appx. 793, 799 (11 Cir.(Fla.) 2008), 2008 WL 2816072, at *4 (11 Cir. (Fla.) July 23, 2008), considered a case which in part involved a Broward Jail Policy that placed restrictions on religious headwear. Significantly, in Hathcock, however, the Court was not faced with a policy denying all headwear for security reasons, as does the written Monroe County jail policy in this case. Rather, the Court in Hathcock considered a Policy requiring prior permission for and inspection of religious headwear, which in pertinent part allowed limited use of a Kufi (in the cell, while being escorted to services, and while at services) if the Kufi had gone through the approval and inspection process.

Presently, some two years after the district court in Georgia (Daker) found no Eleventh Circuit precedent concerning a prison or jail policy restricting religious headwear, computer-assisted research, today, fails to reveal any case in which the Eleventh Circuit has considered a First Amendment challenge to a prison/jail policy completely restricting all use of religious headwear. Although the Eleventh Circuit in Hathcock, did consider a Broward jail policy that was more liberal than the written policy from Monroe County in this case, in the absence of any precedent from the United States Supreme Court, the Eleventh Circuit, or the Florida Supreme Court, establishing the existence of an inmate's constitutional right to possess, keep, and wear religious headwear, and in the light of the existence of other persuasive precedent relied upon by the Dakar Court, holding that no-headwear policies do not violate the First Amendment (see footnote 4, supra), it appears that no reasonable officer would conclude that the Monroe County no-headwear policy, imposed for reasons of security, would not pass constitutional muster under O'Lone and Turner, and it is therefore apparent that the defendant Sheriff (formerly Roth, now Peryam) and the defendant Director Allen, are entitled to qualified immunity on the religious headwear claim.

---

reasonable" attempt to restrict prisoner possession of contraband. Id. at 1215-16.

To the extent that counsel's 1/22/09 letter indicates that despite the written policy, Jewish inmates are now permitted to wear Yarmulkes issued by their visiting Rabi during services, and retrieved by him after the completion of worship, it appears that there has, in practice, been a modification of the written 12/31/08 policy. This, however, still does not mean that the MCDC policy regarding headwear, as written, or applied, is unconstitutional. This is because the policy, denying all inmates the ability to possess, keep, and wear head coverings, is clearly based on a legitimate government interest in maintaining institutional security. Even if an Imam were to volunteer, and go to the MCDC to conduct Muslim services, but brought no Kufi caps for security screening and use during services, there would still be no constitutional violation, since the institution does not and is not required to provide headwear (Yarmulkes or Kufis) at its own cost. On the other hand, if an Imam volunteered to conduct services, brought Kufi caps for security screening, and the MCDC inmates worshiping with him were not allowed to temporarily wear those Kufis during services after a safety clearance and then relinquish them immediately after worship, this could arguably give rise to a violation under the Equal Protection Clause of the Fourteenth Amendment, since the institutional policy appears now to permit use of headwear (Yarmulkes) provided by a Rabi during Jewish services.[5]

Here, there is no suggestion or evidence that any Imam has volunteered to conduct Muslim services at the MCDC, and in conjunction therewith provide Kufi caps for temporary use during worship. In regard to the claim that they have denied him possession and use of a Kufi, it is apparent that defendants Sheriff Roth and/or his successor Peryam, and Director Allen, did not violate the plaintiff's clearly established constitutional rights, and that they are entitled to judgment in their favor based on qualified immunity.

### 3.  **Prayer Beads**

---

[5]    An equal protection violation occurs when the government treats someone differently than another who is similarly situated. See: Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 439 (1985); Lofton v. Secretary of the Dept. of Children and Family Services, et al., 358 F.3d 804 (11 Cir. 2004).

The MCDC Policy provides that inmates may have one pair of prayer beads, however, they must be breakaway. This is to prevent use of beads by an inmate to harm himself, or others [or logically to prevent another inmate from using an inmate's beads to harm him]. (See Affidavit of Penny Phelps). For the purpose of promoting sanitation, the policy also is intended to prevent inmates from obtaining and using non-breakaway beads with cords strong enough to be used as a clothes line in a cell. Without a clothes line, an inmate is less likely to handwash clothes and attempt to dry them in his cell. (Phelps Affidavit). Apart from this promotion of health, it is clear that the policy outlawing non-breakable beads promotes a valid governmental interest in security. Allowing break-away beads, but requiring that all beads be subject to inspection for breakability prior to clearance, is a reasonable alternative means for the inmates to exercise their religious rights, and there does not appear to be any other ready alternative that would both serve the inmates' needs, and the institutional need for security. It appears from the record that when Director Allen or her staff could not locate breakaway beads on the website provided to them by Shepard [the court here notes that no breakaway prayer beads appear on the website www.caravanxpess.com], he was allowed to have a friend mail beads for inspection, and those beads did not qualify as break-away. It also appears that since there have been no visits by Imams, who if they came could bring break-away beads for use during services, Shepard has not had prayer beads for his use.  As was true for Kufi caps, it appears that the MCDC policy regarding breakaway beads, and requiring prior inspection of beads proposed for use, is reasonable, and that as it has been applied it has not worked a deprivation of inmate Shepard's First Amendment rights. Accordingly, on this claim, the defendant Roth and/or his successor Peryam, and Director Allen, are entitled to qualified immunity, and summary disposition of the claim in their favor.

### 4.  **Prayer Rugs**

The MCDC policy ban on possessing prayer rugs is also clearly born of reasonable security concerns. As stated in Phelps' Affida-vit (DE#88-2), textile items not provided by the commissary are considered contraband; and all of an inmate's possessions must fit inside his assigned storage container/locker. (Id). The policy has

been implemented to help reduce the introduction and concealment of contraband items within the jail. (Id.). As stated by Phelps in her Affidavit, inmate Phelps has been provided the opportunity to use the towel exchange program to accommodate his requests for a prayer rug. (Id.). Regarding prayer rugs, which are deemed contraband (MCDC 12/31/08 Policy), it is further explained in the 8/12/08 letter from counsel, that apart from storage concerns, there is the additional concern that a textile object such as a prayer rug [if an inmate were allowed to possess it, and keep it in his cell], could be unraveled and the threads obtained could be used to fashion contraband objects that would pose a risk to security.

In this case, plaintiff Shepard has not cited cases or provided evidence showing that requiring him to use a towel for prayer, as opposed to a rug, violates the tenets of his faith. Courts have held that absent a showing that use of a prayer towel will not suffice to meet the Muslim faith's requirements, it is not clear that denying a prayer rug and offering ability to use prayer towels instead, implicates a constitutional right. (See Williams v. Jackson, No. 8:07-3661-CMC-BHH, 2009 WL 363450, at *9 (D.S.C. Feb. 10, 2009)(citing Hudson v. Maloney,326 F.Supp.2d 206, 209, n.2 (D. Mass. 2004)(a case where Muslim inmates were permitted use of prayer towels, and the court recognized fire hazard, sanitation problems, and potential for concealment of contraband as valid underlying security concerns justifying a ban on prayer rugs). Here, the MCDF "no prayer rug" policy is clearly reasonably related to a valid governmental security concern; and plaintiff Shepard has a ready alternative to use of a normal prayer rug, i.e., his participation in the towel exchange program instituted at MCDC. Apparently on more than one instance, after the towel exchange was instituted, Shepard could not get guards to give him towels; but jail administration [Captain Phelps] wrote a memo on 12/28/08 to cure the problem, informing all officers that Shepard could obtain up to 5 towels a day on which to worship. [See DE#89-9, Ex.H]. The fact that the alternative program offered did not work seamlessly at all times does not render the MCDC no-rug policy unconstitutional. On the claim concerning prayer rugs/towels, the defendants, Sheriff Roth and/or his successor Peryam, and Director Allen, are entitled to qualified immunity, and summary judgment in their favor.

23

####     5.    <u>Dietary Accommodation, and Related Restrictions</u>

On Shepard's claim concerning his religious diet, all defendants (Roth [Peryam] and Allen, at DE#88; Alvarez at DE#81; and Park at DE#95) have responded, arguing they are entitled to qualified immunity, and summary disposition of the claim in their favor.

The record shows that when filling out his Application for a Religious Diet on 11/19/07, Robert M. Shepard listed his religion as Islam, and that from among the available diets (Vegan; Vegetarian; and Kosher) he circled Kosher. (<u>See</u> MCDC Application for Religious Diet, DE#88-8).

Sheriff Roth [whose successor is Peryam] and Allen argue that in this case plaintiff Shepard was approved for, and was provided a Kosher diet for 5 months until he violated the MCDC policy by consuming food that was not part of the diet. They further argue that the policy provides mechanisms for accommodation of religious dietary requests and removal of an inmate from such a diet, and in this case revoking a diet due to inmate non-compliance was reasonable, and did not amount to a constitutional violation.

Park, an assistant manager employed by Trinity, the food service provider at MCDC, argues in her motion (DE#95) that plaintiff Shepard's dietary claim is "misdirected," first because the revocation of his Kosher diet was due to his own failure to comply with his religious dietary restrictions, and second because only MCSO and/or MCDC officials are authorized to terminate or reinstate restricted religious diets. Park states in her Affidavit (DE#96-2) that although she made a report about Shepard eating food not permitted on his assigned religious (Kosher) diet, she (as a Trinity Employee) does not have the power or authority under her job description to prescribe, terminate, or reinstate inmate diets, and she has no involvement or input with designing menus, establishing meal schedules or MCSO food service policy. Park, via her Affidavit (DE#96-2) and Supplemental Affidavit (DE#125) indicates that she verbally reported to Linda Alvarez that while she (Park) was making her usual rounds in the kitchen she observed Shepard and other inmates eating hamburger patties that had been

prepared for service that evening to inmates receiving the general population diet. Alvarez asked Park to reduce her observation and verbal report to writing, and she did so on 4/24/08. Park's written report, about Shepard's consumption of hamburger, appears in the record as Park's Exhibit C (DE#96-2, p.14), and Roth and Allen's Exhibit F (DE#8807). Park's affidavits (DE#96-2 and 125) indicate that she reported the incident because Shepard was on the Kosher Diet Plan, and the hamburger which she saw him consume was not on that plan. Park wrote in her report that she asked Shepard why he was eating the non-Kosher food, and that he said he did so because he was hungry. (See DE#96-2, Ex.C).

The record indicates that there were other failures by inmate Shepard to follow the Kosher diet he had asked for and was assigned. A 4/18/08 memo written by Trinity Director Alvarez to MCDC Program Services Director Allen (DE#88-6, Ex.D) noted that "Mr. Shepard has been eating other things besides what he 'says' is his religious diet." Among the items listed by Alvarez as having been received by Shepard, was bologna, which would be in non-compliance with a Kosher diet. Alvarez further noted in her 4/18/08 communication to Director Allen, that when Shepard was temporarily transferred to Plantation Key [apparently for appearance in court] "he ate the regular diet at that facility."[6] Alvarez ended her 4/18/08 memo to Director Allen by stating, "For these reasons I ask that he be removed permanently from the religious diets altogether." (DE#88-6).[7] On May 2, 2008, Shepard wrote an Inmate Request to Director Allen, referencing a statement by "Linda" that he had been eating non-Kosher food. (Ex.D, DE#88-5). From the

_____

[6]    The date and duration of this transfer to Plantation Key is not specified. Shepard has indicated in his filings that the Kosher diet was not offered at Plantation Key. It is unclear, assuming that Shepard was still on the Kosher Diet plan at MCDC, whether Kosher food was not available at all for inmates at Plantation Key, or whether it was available, but procedural mechanisms were not followed by Shepard or jail staff to ensure that Kosher food was served to him.  It appears that while there, Shepard received the regular jail diet.

[7]    As further discussed, below in this Report, Alvarez asserts that she had no authority to prescribe or terminate a religious diet. Even if it is so that the actual granting or denial/removal of a religious diet was a responsibility of the a MCDC staff member [Programs Director Allen], it would appear from her 4/18/08 memo, that Alvarez, as a Trinity employee, certainly had the ability to influence such a decision.

context of that 5/2/08 Inmate Request, it is apparent that Shepard's religious diet had already been revoked by that date. In the 5/2/08 Inmate Request (Id.), Shepard, attempting to justify having violated requirements of his assigned Kosher diet, made excuses that he was working as a cook. He wrote: Are you aware that I was a cook and it was necessary for me to eat food (non Kosher) to taste. Anything else is a lie." In that 5/2 Request Shepard pleaded: "Im asking you once again to please give me back my Kosher vegan diet or whatever you want to call it." (Id.). In her 5/5/08 Response to Shepard's 5/2 Request, Director Allen wrote: "Mr. Shepard, Just because you were a cook, you should have had someone else taste the food. If was not Kosher you should not have been eating non-Kosher foods." (Ex.D, DE#88-5).  Finally, the record shows that on at least one occasion (on 11/3/08), months after his Kosher diet was revoked, Shepard purchased "BBQ Porks Skins" from the MCDC commissary. (See Park, Supplemental Affid., DE#125; and DE#125-2, at p.3). The record, does not show that he actually ate the pork rinds, as opposed to giving them to another inmate, or trading them to another inmate for something, or for services.

Alvarez, the Former Trinity Food Service Director, argues that, as to her, plaintiff's claim for injunctive relief fails on several grounds. She claims that it is moot, because she  is no longer at Trinity employee at MCDC. She also argues that she cannot be held vicariously liable under the theory of respondeat superior, simply because she held a supervisory position on the food service. Alvarez argues that her only involvement in the termination of plaintiff Shepard's Kosher diet was to report, as she was required to do, his noncompliance with the dietary restrictions of the Kosher diet prescribed for him. Like Park, Alvarez also argues that she, as a Trinity Employee, lacked power or authority under her job description to prescribe, terminate, or reinstate inmate diets, and she has no involvement or input with designing menus, establishing meal schedules or MCSO food service policy.

It is undisputed that when seeking a religious dietary accommodation, Shepard requested that he be placed on the Kosher plan. That request, although not acted upon as quickly as Shepard would have liked (he states that it took 2 months to become

effective), was granted. It is undisputed that the Request Form which Shepard submitted on 11/19/07, warned that eating foods not consistent with the religious diet requirements, was grounds for revocation, as was swapping food items with other inmates, giving away his diet, or eating food items on a regular tray. It is further undisputed, as discussed above, that Shepard on occasions violated his Kosher diet by eating/tasting non-kosher foods.

Under the MCDF Policy, Shepard's Kosher diet was subject to revocation, upon his violation of the terms of the "Application for a Religious Diet" to which he agreed (which mirror the language of the MCDC Policy about such dietary violations and revocations).

The question, then, becomes whether that revocation, and Shepard's return to a regular diet, constituted a violation of his First Amendment rights, in light of his profession of the Muslim faith. In this case, due to the fact that the MCDC regular diet contains no pork or pork byproducts, it is apparent, that the answer to that question is, No.

Where courts have held that for Muslim inmates a jail or prison need only provide a pork free diet, and that a Kosher diet or Halal meals are not required; and that even if a Kosher diet had been provided as an accommodation, but was then revoked due to the inmate's non-compliance with his diet, this does not offend Muslim dietary requirements so long as the diet served thereafter is pork-free. See: Ashelman v. Wawrzaszek, 111 F.3d 674, 677 (9 Cir. 1997)(stating in an earlier opinion "we recognized that requiring a believer to defile himself by doing something that is completely forbidden by his religion is different from (and far more serious than) curtailing various ways of expressing beliefs for which alternatives are available)(citing Ward v. Walsh, 1 F.3d 873 (9 Cir. 1993); Muhammad v. Crosby, No. 4:05cv193-WS, 2007 WL 2376050, at *4 (N.D.Fla. Aug.16, 2007) (citing Hudson v. Maloney, No. Civ.A. 01CV12145RGS, 2004 WL 626814, at *1 (D.Mass. March 30, 2004) (case denying motion for preliminary injunction to require prison to proved Halal meals, and in doing so, noting that "a raft of precedent holds that providing Muslim inmates with a pork-free diet satisfies the First Amendment")); Cox v. Kralik, No. 05 Civ.

5917(DLC), 2006 WL 42122, at *1 (S.D.N.Y. Jan.6, 2006)(granting summary judgment to prison officials, and in doing so holding that providing Kosher and vegetarian meals fulfills the dietary requirements of the Muslim faith); <u>Muhammad v. Warithu-Deen Umar</u>, 98 F.Supp.2d 337, 344-345 (W.D.N.Y. 2000)(no constitutional violation where a Muslim inmate was denied Kosher meals because an available Religious Alternative Meal, or RAM, did not offend any Muslim dietary requirement).


### III     <u>CONCLUSION</u>

The standard for reviewing a request for preliminary injunctive relief requires a plaintiff to establish 1) a substantial likelihood that he will prevail on the merits, 2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, 3) that the threatened injury to him outweighs the potential harm the injunction may do to the defendant, and 4) that the public interest will not be impaired if the injunction is granted. <u>See</u> <u>United States v. Jefferson County</u>, 720 F.2d 1511, 1519 (11 Cir. 1983); <u>Johnson v. U.S. Dept. of Agriculture</u>, 734 F.2d 774 (11 Cir. 1984); <u>Canal Authority of Florida v. Callaway</u>, 489 F.2d 567, 573 (5 Cir. 1974). This type of relief is an extraordinary and drastic remedy, which should not be granted unless the person seeking relief "clearly carries the burden of persuasion" of all four prerequisites, which is always on the plaintiff. <u>California v. American Stores Company, et al.</u>, 492 U.S. 1301 (1989); <u>Jefferson County</u>, <u>supra</u>, 720 F.2d at 1519 (citing <u>Canal Authority</u>, <u>supra</u>); <u>Johnson</u>, <u>supra</u>. In this case, on each of plaintiff Shepard's claims, for reasons discussed <u>supra</u>, at length, in Section II of this Report, it is apparent that he (plaintiff) does not have a substantial likelihood of success on the merits; and that he has not shown that threatened injury to the him if an injunction were not to issue, would outweigh the potential harm to the defendant(s) if an injunction were to issue.

For the reasons discussed, above, it is therefore recommended that: 1) the Motion for Summary Judgment by Alvarez (DE#81) be granted; 2) the joint Motion for Summary Judgment by Allen and Roth (DE#88) be granted; 3) the Motion to Dismiss, or Alternatively for Summary Judgment by Park (DE#95) be granted; 4) this case be Closed; and 5) all pending motions, not otherwise ruled upon by separate order, be dismissed, as moot.

Objections to this report may be filed with the District Judge within ten days of receipt of a copy of the report.

Dated: August 20th 2009.

_____

UNITED STATES MAGISTRATE JUDGE


cc:  Robert Michael Shepard, Pro Se
     Jail No. 7016725
     Monroe County Detention Center
     5501 College Road
     Key West, FL 33040

     Jason Lee Scarberry, Esquire
     Purdy, Jolly, Giuffreda & Barranco, P.A.
     2455 E. Sunrise Blvd., Suite 1216
     Fort Lauderdale, FL 33316

     Edward J. Page, Esquire
     Ellen Koehler Lyons, Esquire
     Carlton Fields, P.A.
     4221 West Boy Scout Boulevard
     10th Floor - Corporate Center III
     Tampa, FL 33067-5736


     The Honorable James Lawrence King,
     United States District Judge